# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-KA-01283-SCT

*IRA DONELL BOWSER a/k/a IRA BOWSER a/k/a*
*IRA D. BOWSER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/16/2014 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/29/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., PIERCE AND COLEMAN, JJ.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1. Ira Bowser admitted to killing Shabree Page at their apartment on June 9, 2012. The question at trial was whether Bowser's actions were a product of deliberate design murder, second degree murder, heat of passion manslaughter, or self defense. The jury returned a verdict of deliberate design murder, and the trial court sentenced Bowser, as a habitual offender, to life in the custody of the Mississippi Department of Corrections. On appeal, Bowser challenges the weight and sufficiency of the evidence. We find sufficient evidence

to support the jury's verdict of murder and that the jury's verdict is not against the overwhelming weight of the evidence; therefore, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. At 2:14 on the morning of June 9, 2012, Officer Mickey Moran received a call about an abandoned car on Oak Park Drive, right off of Highway 90, in Long Beach, Mississippi. The vehicle was registered to Joyce Lynn Bowser, and Officer Moran went to the address on record. Ira Bowser's niece, Shronda Bell, was the only person at the residence. Bell told Officer Moran that the car belonged to Bowser. After Officer Moran left, Bell then went to the apartment Page shared with Bowser. When she arrived at Page's home, the door was locked, and no one initially came to the door. Bell eventually got Page's five-year-old daughter to open the door. Once inside, Bell found Page lying on the floor, and she then immediately "ran out and grabbed the baby and put her in the car," before calling 911. Officer Moran was dispatched to the scene where he again talked to Bell, who was still at Page's apartment. Officer Moran went into the apartment and found Page lying naked on the floor with what appeared to be puncture wounds all over her body.

¶3. Ira Bowser, Page's boyfriend, turned himself in and admitted to killing Page. Bowser testified that, at the time he left Page's house, he did not know he had stabbed Page twenty-nine times. He said:

> In my mind[,] I'm fixing to leave because she is fixing to call the police and I'm going to go to jail again, you know what I'm saying. I didn't look around. I looked her directly in her eyes and she was looking at me, and I seen pain in her eyes, and I just jumped up and took off straight out the door. I didn't lock no door when I left.

2

Bowser stated he did not know where he was going, but that he "headed east on Highway 90." He then parked his car, and walked into the water, losing his phone in the process. He said that he thought the police would be looking for him. Eventually, he came upon a girl he went to high school with who told him that Page had been found dead. Bowser testified that he threw up instantly when he was told Page was dead. Bowser said at that point he was "gone," and so he went to a hotel, lay on the floor in the lobby, and asked the clerk to call the police because he had "murdered" his girlfriend.

¶4.     After Bowser turned himself in, he was photographed for any injuries he may have sustained. He had several small scratches on his right hand, right forearm, right wrist, and the right side of his neck. The scratches did not bleed.

¶5.     Bowser was indicted for deliberate design murder. He was tried before a jury on July 15-16, 2014. The issue at trial was whether Page's death was the result of deliberate design murder, depraved heart murder, heat of passion manslaughter, or self defense. At trial, the State presented DNA evidence and fingerprint evidence pointing to Bowser as the perpetrator. The State also presented numerous photos of the crime scene, depicting the couch askew in the living room, a cell phone on the floor in the living room, torn underwear in Page's bedroom, bloody footprints leading from the bedroom, and Page's body, covered in her own blood. Further, the State presented the expert who performed the autopsy, Dr. Paul McGarry, who testified that Page was stabbed twenty-nine times; the stab wounds were on Page's upper torso from her waist to her scalp; and the stab wounds ranged from one inch deep to five inches deep. Dr. McGarry also testified that the wounds were "consistent with repeated

3

deliberate aimed thrusts of a stabbing object directly into the center of a person's body repeatedly and with great force."

¶6.     Bowser testified on his own behalf, and Bowser's testimony is the only testimony establishing the relationship between Bowser and Page and the events of the evening leading up to Page's death. Bowser testified that he and Page had known each other for more than twenty years. Their relationship was not always peaceful. They had broken up and gotten back together numerous times. Bowser admitted he had cheated on Page, and he said that, at times, she would cut him. Bowser qualified that Page was not trying to take his life; she did it when she had caught him cheating. The week before June 9, both Bowser and Page went to jail for a domestic dispute, but within a couple of days of their release from jail, they were talking and seeing each other again.

¶7.     Bowser further testified that on the evening of June 9, Page had asked Bowser to come to her house in Pass Christian, Mississippi. Bowser stated that he took his time getting to Page's house, stopping to get alcohol and drugs. He said he had not called Page all day, and she was upset with him. They started arguing before Bowser got in the door about whether he was going to use his key to enter the house or whether she was going to let him in because she was on the couch. Bowser testified that:

> Well, at first she was fussing, and she got in front of me. And I was trying to go get in the bed. I was like move, you know what I'm saying. She like, you ain't going to tell me where you been, you need to go back to who you been with. I'm like, I'm fixing to get in the bed, get out the way, you know what I'm saying. I pulled her hair. She hit me. And I tried to grab her, you know what I'm saying. When I started to grab her, I grabbed her by her shirt. She come out her shirt, you know what I'm saying. She got on the bed.

4

. . .

I was trying to grab her to hold her so she would stop. Usually if I hold her for a minute she will chill out, you know what I'm saying.

. . .

But she come out the shirt, you know what I'm saying. She got on the bed. I tried to grab her again. I grabbed her by her underwear, shorts, whatever she had on, and she kicked out, you know what I'm saying. She kicked me. I kind of fell back or whatever. I don't know, I guess the knife was on the table right there. We keep stuff like that in the room. She grabbed it. Not saying she was trying to hurt me with it, nothing like that. I don't know, I mean, she grab a knife, swing, but, I mean, ain't like she came at me like this or nothing, I don't know.

. . .

Yeah, but she didn't -- I mean, she didn't connect with me, nothing like that. I don't know. She swung the knife, but she wasn't trying to hurt me.

. . .

I took the knife from her -- I took the knife from her and I cut her on her arm.

. . .

And she was like, and in a way I kind of looked at her, you see what you did, you know what I'm saying. I mean, kind of like, you see what you did, you know. She started hitting me, and I flashed out. I flashed out. And I don't, to be totally honest with you, I really don't know it was that bad. I really don't remember what I did beside cutting her on her arm. . . . I don't know, but I mean, when I came to she was laying there. She wasn't saying anything. I looked directly in her eyes, you know what I'm saying. So in my mind I'm thinking, okay, we should call the police. I'm looking around. I'm thinking she's hurt, and I just left, straight up just left. I didn't look, I didn't search nothing, I didn't check nothing. I mean, I don't even remember dropping the knife. I don't remember what I did. I just remember leaving.

¶8.     After hearing all the evidence presented, the jury was instructed on deliberate design murder in the first degree, depraved heart murder in the second degree, heat of passion

5

manslaughter, and self defense. The jury found Bowser "guilty of murder," which under jury instruction C-5, constituted deliberate design murder. Bowser qualified as a habitual offender, with three prior felony convictions. The trial judge sentenced Bowser to life in prison. Bowser filed a motion for a new trial or, in the alternative, a motion for a judgment not withstanding the verdict (JNOV). The motion was denied, and Bowser appealed.

## STATEMENT OF THE ISSUE

¶9.     On appeal, Bowser brings one issue.

> **The evidence was insufficient to support the verdict; alternatively, the verdict was against the overwhelming weight of the evidence which established that Bowser was guilty only of manslaughter.**

Because the sufficiency of the evidence and the weight of the evidence are two different standards, we will analyze the issues separately:

> **I.      Whether the evidence was sufficient to support a verdict of deliberate design murder.**
>
> **II.     Whether the verdict was against the overwhelming weight of the evidence, which established that Bowser was guilty of only manslaughter.**

## STANDARD OF REVIEW

¶10.    A motion seeking a judgment notwithstanding the verdict challenges the sufficiency of the evidence, and the "critical inquiry is whether the evidence shows 'beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.'" ***Bush v. State***, 895 So. 2d 836, 843 (Miss. 2005) (***Carr v. State***, 208 So. 2d 886, 889 (Miss. 1968)). On the other hand, a motion for a new trial

6

challenges the weight of the evidence, and a ruling on that motion is viewed under the abuse of discretion standard. **Smith v. State**, 925 So. 2d 825, 832 (¶16) (Miss. 2006).

**ANALYSIS**

I.      **Whether the evidence was sufficient to support a verdict of deliberate design murder.**

¶11.    The Court has stated:

In considering whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows "beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction."

**Bush v. State**, 895 So. 2d at 843. The Court does not determine whether "it believes that the evidence at trial established guilt beyond a reasonable doubt, . . . [but] whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." **Id.** (citing **Jackson v. Virginia**, 443 U.S. 307, 315 (1979)). Further, if the facts and inferences "point in favor of the defendant on any elements of the offense with sufficient force, that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is for the appellate court to reverse and render." **Id.** (citing **Edwards v. State**, 469 So. 2d 68, 70 (Miss. 1985)) (internal citation omitted). However, the evidence is sufficient if, keeping in mind the beyond-a-reasonable-doubt burden of proof standard, reasonable men, exercising impartiality, might be led to different conclusions on every element of the offense. See **id.** (citing **Edwards**, 469 So. 2d at 70).

¶12. "To prove murder, the State must show that a person was killed without the authority of law, and the killing was done with the deliberate design to effect the death of the person killed or of some other person." *Jones v. State*, 39 So. 3d 860, 865 (¶32) (Miss. 2010) (citing Miss. Code Ann. § 97-3-19(1)). Deliberate has been defined as "full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences." *Id*. Design has been defined as "to calculate, plan, contemplate." *Id.* at 865-66. Deliberate design "may be formed very quickly, and perhaps only moments before the act of consummating the intent." *Id.* at 866. The jury is allowed "to draw reasonable inferences from facts based on experience and common sense." *Howell v. State*, 860 So. 2d 704, 739 (¶125) (Miss. 2003). Further, "the jury is the sole judge of the credibility of witnesses, and the jury's decision based on conflicting evidence will not be set aside where there is substantial and believable evidence supporting the verdict." *Nicholson v. State*, 523 So. 2d 68, 70 (Miss. 1988).

¶13. The evidence provided at trial shows that there was some form of a fight, or tussle, and a brutal homicide. The State presented evidence of the number, depth, and position of Page's stab wounds and that the stab wounds were consistent with deliberate thrusts. The State presented evidence of scratch marks on Bowser that did not draw blood. The State presented testimony that the couch was moved, a cell phone was on the floor, and a woman's underwear was torn and strewn in the doorway. The State also presented testimony that the front door of the house was locked and that the kitchen light was on when Bell arrived at the house. Bowser presented only his testimony depicting his account of the events, which the jury was

8

free to disregard if it thought the testimony was not credible. *See Nicholson*, 523 So. 2d at 70. Additionally, although Bowser did not remember actually stabbing Page, he repeatedly admitted that he was guilty, that no one else could have stabbed Page because he was the only other person there, and that it was not in self defense.

¶14.  Considering the evidence in a light most favorable to the State, the Court finds the essential elements of the crime could be found beyond a reasonable doubt. Accordingly, there is sufficient evidence of deliberate design, and the instant issue is without merit.

> **II.  Whether the verdict was against the overwhelming weight of the evidence, which established that Bowser was guilty of only manslaughter.**

¶15.  In his brief, Bowser argues that the overwhelming weight of evidence establishes that he killed Page in the heat of passion. Appellate review of the denial of a motion for a new trial based on the weight of the evidence requires the Court to view the evidence in a light most favorable to the verdict, and the verdict will be disturbed only "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush v. State*, 895 So. 2d at 844 (¶18) (citation omitted)). Further, "[a] reversal on the grounds that the verdict was against the overwhelming weight of the evidence . . . 'does not mean that acquittal was the only proper verdict.'" *Id.* (quoting *McQueen v. State*, 423 So. 2d 800, 803 (Miss. 1982)). Thus, the inquiry is not whether manslaughter was the proper verdict, but whether the verdict reached by the jury was against the overwhelming weight of the evidence. *See Bush*, 895 So. 2d at 844 (¶18). A new trial should be granted only in "exceptional cases in which the evidence preponderates heavily

against the verdict." ***Smith v. State***, 925 So. 2d 825 (Miss. 2006) (citing ***Bush v. State***, 895 So. 2d at 844.

¶16.    At trial, Bowser testified that he and Page had a volatile relationship. After a day of drug and alcohol use, Bowser returned to the home he and Page shared. Bowser testified that he had taken at least five Loratabs, had been drinking, and had used cocaine before coming home. Upon Bowser's arrival at home, Page demanded to know where he had been and why he had not called her all day. Unwilling to discuss the topics, Bowser insisted that Page just let him go to bed. Page continued with her questions and followed him into the bedroom. Bowser admitted that he pulled her hair and she hit him in his privates. He then tried to grab her, but she came out of her shirt. He tried to grab her again, but succeeded only in ripping her underwear or shorts off of her. He testified he was attempting to grab her to calm her down. According to Bowser, Page then kicked him off her, grabbed a knife from the table in their bedroom, and "she swung the knife, but she wasn't trying to hurt me." Bowser then took the knife from Page and cut her on the arm; he then stabbed her twenty-eight more times, but he claims he did not remember stabbing Page the remaining twenty-eight times. In his words, he just "flashed out." On cross-examination, Bowser admitted that he felt satisfaction after he cut Page's arm the first time: "Yeah, I was like, that's what you get."

¶17.    Dr. McGarry, the State's forensic pathologist expert, testified that "[t]his kind of pattern indicates that someone is deliberately driving a knifelike object into another person's body repeatedly right toward the center of the body aiming at the vital areas of the body." He repeated his opinion that the stab wounds were deliberate throughout his testimony. Dr.

10

McGarry testified that the wounds were inconsistent with an accidental or unintentional stabbing, and based on his fifty years of experience, Page died of massive blood loss due to twenty-nine stab and cut wounds that caused damage to internal arteries and organs. Bowser did not conduct voir dire or object to Dr. McGarry's qualifications as an expert witness, nor did Bowser object to any of Dr. McGarry's testimony at trial.

¶18. It is undisputed that Bowser stabbed Page twenty-nine times with a kitchen knife, and Page died as a result of the injuries. Therefore, the only issue is whether Bowser is guilty of murder or manslaughter. "Intent, being a state of mind, is rarely susceptible of direct proof, but ordinarily must be inferred from the acts and conduct of the party and the facts and circumstances attending them which reasonably indicate them to the minds of others." *Thames v. State*, 221 Miss. 573, 577, 73 So. 2d 134, 136 (1954). "It has always been the law in this state that the unexplained proof that the defendant killed another with a deadly weapon authorized a jury find malice and convict of murder." *Nicolaou v. State*, 534 So. 2d at 172 (citations omitted).

¶19. Bowser claims that the evidence supports only a heat of passion conviction; however, his own testimony belies such claim. Heat of passion has been defined by the Court as:

> [A] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Graham v. State*, 582 So. 2d 1014, 1017-18 (Miss. 1991). Bowser does not claim that he became so enraged with Page that he stabbed her, or that their fight was anything out of the

11

ordinary for them. Instead, Bowser testified that, even though Page swung a knife at him, he knew she was not trying to hurt him. He does not claim that anger or rage caused him to "flash out" and stab Page twenty-eight more times.[1] Indeed, he has no real explanation.

¶20.    While the case of *Nicolaou v. State*, 534 So. 2d at 172, involves the beating death of a victim and not the use of a knife, the Court held "[t]here was ample evidence for the jury to have found that Poole died from the brutal, savage and repeated violence inflicted upon him by Nicolaou with no lawful justification, excuse, or mitigating circumstances. The record fully supports his conviction of murder."[2] Similarly, in another case, the Court affirmed a murder conviction, stating:

> No serious point is made on appeal with respect to the actual guilt of appellant and the only argument made is that there was no evidence of malice or premeditation or deliberate design by the appellant to take the life of the deceased. *This was a most brutal murder. The deceased was stabbed several times about the chest and head. No plan or malicious scheme need be proved by the State. Malice is implied by the use of a deadly weapon.*

*Stokes v. State*, 240 Miss. 453, 477, 128 So. 2d 341, 350-51 (1961) (emphasis added).

---

[1] When asked on cross-examination whether he thought the drugs and alcohol could have been to blame, Bowser testified: "I mean that [(the stabbing)] was so bad I can't blame that on no drugs. That was like a devil possessed me or something . . . ."

[2] The Court in *Nicolaou* cited an Alabama Supreme Court case, which states:

> If death came from cumulative wounds and beatings so severe and so repeated as to convince the jury beyond a reasonable doubt of an intent to kill, all the elements of murder in the first degree were present. No provocation to mitigate or overcome the inference of malice, or wicked motive was shown nor claimed.

*Nicolaou v. State*, 534 So. 2d at 171 (quoting *Oliver v. State*, 234 Ala. 460, 175 So. 305, 309 (1937)).

¶21.    The analysis of a challenge to the weight of the evidence does not require the Court to determine whether manslaughter was the proper verdict.  After observing the live testimony of the witnesses and viewing the evidence presented, and after being instructed adequately on first degree murder, second degree murder, and heat of passion manslaughter, a jury could have, and did, find Bowser guilty of murder.  "Though in the past we have overturned verdicts which were based on evidence so 'extremely doubtful that it was repulsive to the reasoning of the ordinary mind, . . . this is certainly not one of that quality.'" *Dilworth v. State*, 909 So. 2d 731, 738 (¶23) (Miss. 2005) (internal citation omitted). We cannot see how allowing the verdict to stand would sanction an unconscionable injustice.

## CONCLUSION

¶22.    The Court finds that sufficient evidence supported the jury's verdict convicting Bowser of murder, and the jury's verdict was not against the overwhelming weight of the evidence. Therefore, we affirm the judgment of the trial court.

¶23.    **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT, AS A HABITUAL OFFENDER, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.    APPELLANT IS NOT ELIGIBLE FOR PAROLE OR PROBATION.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR.**